The next case for argument this morning is case number 24-1644 Mutakaber v. Secretary of State. Mr. Qasimi, you reserve three minutes for rebuttal in this case. Is that accurate? Okay. You can proceed when ready. Good morning, Your Honors. May it please the Court. Anayat Qasimi, counsel for Appellant Abdulmutakaber. Your Honors, the Board's ruling is not consistent with case law established by this Court on at least four issues of law addressed in the ruling, each of which presents sufficient basis for reversal of the Board's ruling. One, the Board's reading of the plain language, the expressed language of the leases is inconsistent with the case law established in this Court in two areas. First, the Board's ruling fails to properly and fully analyze expressed language of the leases that's relevant to return of the premises. The law established by this case requires that a contract must be construed in a manner that gives meaning to all of its provisions and makes sense. I draw the Court's attention to MACB construction, United States 97 F3rd 1431. Also, Gold, Inc. BUS 935 F2nd 1271. This Court ruled that contract interpretation What specific provision are you referring to that you say is inconsistent with? Your Honors, the reading of the provisions, Articles 8 and Articles 14 of the leases in particular. What in particular? In particular, Your Honors, what the Court says is, first of all, the Board says that there's the language, the leases did not require return of the premises. Could you point us to a JA page while you're answering the questions posed by Judge Lynn? The ruling of the Board is in Appendix 9. In Appendix 9, the Board says that the lease language does not require return of the premises. Now, the lease, there are multiple leases here. They vary. At least one of the leases has language that specifically requires or discusses return of the premises. What language are you referring to? I'm referring to Article 8 of the Champaign lease. Give me an Appendix page, please. That would be Appendix 65, Your Honors. The second flaw with the Board's ruling. We're at page 65, so what specific provision are you referring to? This is 8C. The tenant will not be responsible for restoring premises to any condition for any changes or damages to the premises. The premises are leased as is conditioned and may be returned as is conditioned as of the date of the lease expiry or termination. Where does it talk about return? The language may be returned as is conditioned. That's the condition of the premises, not the return of the premises. That was the reasoning of the Board. Your Honor, our position is that that interpretation renders the word return superfluous and meaningless. What specific provision from the lease agreements are you relying on for your physical return argument? Your Honors, the leases are different. Why don't we look at the lease that we've been looking at so far, the Champaign lease, and tell us which provision specifically. That would be 8C. Let me ask the question so we can keep our record clean and then you answer, okay? I just want to know what specific provision in the Champaign lease are you relying on for the physical return requirement? Is this 8C or is it something else? 8C, Your Honor. And only 8C, is that right? Correct. But you have to concede, 8C doesn't say in all events, even acts of war or if the government terminates for convenience, the government as tenant must return the physical premises to the landlord. 8C doesn't speak to any of that. That is correct, Your Honor. So it's an argument from implication, right? There's no express provision that says the government must return the property. There's a question, Your Honor, of what's the dominant purpose of this provision. In our view is that the dominant purpose of this language in 8C is that the property should be returned as is conditioned and not the condition of the property. Because otherwise you would render the word return useless and meaningful. But isn't the premise of that paragraph 8C clear from the first sentence in that paragraph? It talks about tenant will not be responsible for restoring the premises to any condition or for any changes or damages. And then it says the premises are leased as is and may be returned in the as is condition when the lease expires or terminates. It's talking about the condition of the premises. It's not talking about the physical return of property. I mean, why am I wrong? That is, in this particular lease, that's correct, Your Honor. It is talking about the condition. But the word return is mentioned in there. Well, yes, but it's in the context of that paragraph. And imposing a separate physical return obligation is, to me, is a bit of a leap. Our interpretation, Your Honor, is that the board should have looked at the word return as meaning that there was a requirement to return the premises in the condition that it was. I understand your position. What about Article 11, which the board also relied on, damages to the premises on A66? Doesn't that provision indicate the parties here bargained for the landlord is going to bear responsibility for all risk of loss or damages to the premises, including under these circumstances? I would suggest that's at least the question. And your position that return requires the physical return under these circumstances would seem to render Article 11, if not superfluous, it would change the way the parties allocated these risks. Your Honor, the Article 11 risks, Article 11 discusses damages to the premises. The board found that there was no damage to the premises. And also Article 11 exempts or accepts situations where it's the fault of the government that causes any damages to the government. And our argument is that in this case, it's the government's breaches that has caused the tenant, the landlord, not to receive his property back rather than whatever the Taliban takeover, which is what the board cites here. Because, as a matter of fact, the board found that the Taliban takeover had no impact on the premises or on the properties. There was no damage to the properties. It was just a decision of the government to abandon the properties. You said the government's breaches. What in particular are you referring to in terms of what you're contending would be the breach? Your Honor, the facts of this case are complex, but these are properties that were released by the U.S. Embassy. The U.S. Embassy and only the U.S. Embassy had access to them. Obviously, these are the facts that the counsel for the government may not fully agree, but I draw the board's attention to the court's attention to the transcripts of some of the depositions that are in the joint appendix. And I'll give a citation in a second. In Mr. Mutakabir's case, the embassy had actually walled these properties. There were gates, embassy gates, that protected these properties because they had become part of the premises of the embassy. Those gates were locked. They were sealed. Nobody was authorized to go into it. The landlord never had the ability to get to those properties. As such, when the embassy left, to this date, as far as the Taliban are concerned, they're part of the embassy. It's not that the properties were damaged, but they're sealed by the Taliban as part of the premises. Counsel, what do you contend are the specific actions the government would have needed to take, in your opinion, to return the property? There are two things that the government could have done. And one is that the government… Or that the government would be required to do, is what I want to know. The government was required to protect the premises under the leases and under the law. They made an arrangement for some of the premises to be transferred, control of them to be transferred to the government of Qatar under an agreement, where the embassy and a number of other premises that the embassy had were transferred to Qatar. Qatar managed those, and the government had the option to do that with respect to these premises. The government chose not to do it. The second thing is that the government had the option to terminate these before the government evacuated. They were looking into it. The facts show that they were planning on all of these things, but they did not communicate until they actually evacuated. Then weeks later, they sent notices by email. The government has taken absolutely no action whatsoever to facilitate the return of the premises to the landlords. And you're contending that we need to rely on 8C to get to these sort of obligations you're saying the government would need to… Your Honor, not just 8C, but also the implied duties, also the Afghan law requirements. This lease is governed by Afghan law, and Afghan law has specific provisions that deal with the return of the premises. Also, the implied duty of good faith and fair dealing. The landlord here never intended for his premises to be lost in perpetuity because of some action of the government. That's the situation right now. He does not have his premises back. He does not have the properties back. So what we're asking the court to do is to look at all four factors that I mentioned, which is the misreading of the express language of the leases. And again, Your Honor, the leases vary from one lease to another, the language. The implied obligation to return the premises that should be read into the leases. Afghan law requirements, and Afghan law is the governing law in these leases. And then the implied duty of good faith and fair dealing, which requires… What you contend is the import of, on appendix page 70, article 17. So as you can see in 17A, it talks about this written agreement constitutes the entire understanding of the law. Your Honor, this is a standard provision, which is included in all the leases, obviously. I don't think that that has any impact on what we're asking. You say that there are some differences in the contracts, but I don't think you've argued that the outcome should be any different for any of the properties that are at issue in this case. Is that right? That is correct, Your Honor, because if there's any differences, it's in the express language of the leases, not, I think, the implied obligation and the Afghan law obligation and the duty of good faith. The differences in the express language make no difference to the issues before. It does make a difference. There are slight differences, but at the end of the day, we believe that the dominant purpose of H.C., the use of word return in H.C., was the return of the premises. Some of those did not contain it, and we believe that the board should have read that into it because it's an essential term that's missing. A lease without a return obligation is not a lease. When the landlord and tenant enter into a lease agreement, it was their expectation from day one that at the end of the lease, the premises would be returned to the landlord. That's an essential term. There were some slight differences from lease to lease. Which of the leases contains the language most favorable to you? In the case of Mutakaber, this is the only lease, to my knowledge, that contains the word return. There are other leases that contain the obligation to maintain the premises in a tenantable condition, which means, in our interpretation, it was the landlord's expectation that the premises would be protected and preserved, and at the end of the lease term, he would be able to lease it to other tenants. So is it true, then, that the Champaign Agreement would have the language that you contend is most favorable to you on this return argument you're making? Your Honor, that is correct. Yes, that's the only, of Mutakaber cases, leases, that's the only one that contains the word return. That's the paragraph 8C we were talking about earlier. That is correct. Also, paragraph 14, which is the termination for convenience clause, has no disrequirements. And it's our belief that some of the leases, not in this particular case, but in the next case, we'll argue that there is a specific language with respect to return. So, Counsel, you are almost through all of your rebuttal time. Do you have any final thought, or do you want to reserve the, I guess, eight seconds left? I will give you a little bit more. I would appreciate the rebuttal time, yes. Mr. Rales, you may proceed. Thank you, Your Honor. May it please the Court, the question in this appeal is whether, in order to terminate the leases at issue, the United States was required to take military or diplomatic action to ensure that the Taliban would permit Mutakaber to retake control of his properties after the United States evacuated the properties and terminated the leases. And the answer to that question is no, the United States was not required to do that. The leases provided that the United States could terminate them for convenience by providing written notice to Mutakaber, and none of the lease provisions were required to terminate the leases. Rather, multiple provisions of the leases, Paragraphs 8, Paragraphs 11A, demonstrate that the United States was not responsible for the harm caused by the actions of hostile third parties like the Taliban. And so the CBA's decision in this case should be affirmed. Just a couple points in response. Mentioned in the opening, there were gates, that these properties were behind gates. There's no dispute in this case that the Taliban was who prevented Mutakaber's representative from accessing the properties after the United States evacuated and the leases were terminated. I thought the court seemed to have a good understanding of the terms of the leases. I'm happy to answer any questions about those or any other issues the court has, but otherwise. You could have, it sounds like, done it differently, maybe terminated earlier at a time when the U.S. government still controlled the physical access to these premises. Why doesn't that give rise to at least an implied obligation? Knowing you have to return a property at the end of a lease, why isn't there some merit to that argument? The United States had the right to terminate for convenience at any time during the term of the lease. So yes, it could have terminated in June of 2021. It also could have terminated in September of 2021 when it did. It had that right. The fact that it had already evacuated upon the advance of the Taliban on Kabul doesn't eliminate the right to terminate for convenience. My understanding is that certain property was put under protection. I don't know if that's the right phrase, but my understanding is not these, not anything that's in this case or even the next case. Can you give us any insight regarding why these wouldn't fall within the ones that you would have been trying to protect? The United States simply made a decision that these weren't properties that it wanted to put under the non-binding monitoring agreement with Qatar. And that was a diplomatic decision that was made that it preferred to terminate these leases. It didn't feel the need to attempt to go forward with them. And so that's the reason. How does your understanding of the termination for convenience provision not render 8C, at least in the Champaign lease, superfluous? It's got that reference to return. Isn't your view, it's at page 865. Isn't your view of how broadly the termination for convenience right is, doesn't it have the effect of rendering that portion of 8C superfluous, at least in the Champaign lease? No, the provision of 8C, it was meant to describe the condition of the property at the end of lease, whether expiration or termination. The tenant will not be responsible for restoring the premises to any condition or for any changes or damages to the premises. The premises are leased in as-is condition and may be returned in the as-is condition as of the date of the lease expiry or the termination. So at the termination, the government gave notice to Boudicaba that it was terminating the leases. The United States was no longer controlling access to that area. The Taliban has apparently taken control of that area. And from the United States perspective, Boudicaba had an unfettered right to access his property at that time. He was no longer bound by the terms of 7A to have an escort or anything like that under the leases once the termination was effective. So it's the Taliban. But on the other hand, the U.S. did nothing to return the property to the landlord. Well, but the United States – I mean, that was – in fact, under the circumstances, that was the return of the property was that he's no longer bound by, for example, Article 7A of the leases that would require him to have an escort and have approval of the United States to go to the property. He's free from the United States' perspective to do whatever it is he wants with his property. It's the Taliban that's preventing Boudicaba from doing that. Unless the court has any other questions, we respectfully request that the court affirm the board's decision. Thank you, counsel. I will give you, because we asked you a few questions, two minutes of rebuttal. Thank you, Your Honor. I mentioned earlier about the facts of the circumstances of the premises. This is Appendix 1140 to 1298. Paul Hendricks is the embassy's regional security officer. His deposition transcript, he'll explain what the premises were and where they were located and how challenging it was. What counsel just said is that it's the Taliban that did not allow the landlord to get his access to his property. That's not entirely accurate. It is true that the Taliban did not let him, but the Taliban told him that this is embassy. You cannot go into the embassy because this is the gate. There are two gates, and past those gates is all considered embassy premises, and they have sealed that. So that's one thing. Second, we've never asked the government to take diplomatic or military action to cover these. We've simply stated the government had a duty to protect these premises, and they had a duty to obligation to return the premises. They could have done it. Counsel, how did you expect them to protect the premises if it wasn't with military action? What did you expect them to do as a practical matter? They could have entered into the Doha agreement, the arrangement with the Qatari government that protects all the premises. They could have come in and made arrangements for the landlord to take over. Is that diplomatic action? It's diplomatic action, but they've done it. They could have done it. They have done it. You do or do not expect them to have to take military or diplomatic action? Your Honor, we do not expect the United States government to take military action to recover those premises. What we expect is to do what they could have done, and the facts clearly establish that they could have done more than what they did. In the entire timeline, there was only one email that they sent. The government never terminated the contracts for convenience. They terminated on force majeure grounds. My understanding is that they waited so that they could terminate it under force majeure, but then the board found that there was no force majeure, so the board constructively converted the termination to termination for convenience, which we believe requires return of the premises and has other obligations with it. So there was no – they had the option to do that. Time is running out. Do you have one final thought that you want to leave the court with? No, Your Honor. Thank you. Thank you. Case submitted.